**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**BRIAN NELSON** **PLAINTIFF**
**ADC #148443**

**v.** **No: 4:19-cv-00482 SWW-PSH**

**MELANIE JONES** **DEFENDANT**

# PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Susan Webber Wright. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I. Introduction

Plaintiff Brian Nelson, an inmate confined at the Wrightsville Hawkins for Males Unit of the Arkansas Division of Correction (ADC), filed this *pro se* 42 U.S.C. § 1983 action alleging that he has been denied adequate medical care for swelling in his leg, deep vein thrombosis (DVT), and a pulmonary embolism from July 8, 2017,

through August 5, 2019 (Doc. Nos. 2 & 6). Nelson filed several addenda to his amended complaint. *See* Doc. Nos. 31, 33, 41-42, 52-53, & 70-71. He sues defendant Dr. Melanie D. Foster Jones in her personal capacity.[1] *See* Doc. Nos. 6, 41 & 70. On a prior motion for summary judgment, the Court determined that Nelson exhausted available administrative remedies with respect to certain claims against Dr. Jones and dismissed all other claims against her. *See* Doc. Nos. 114 & 118.

Before the Court is a motion for summary judgment, brief-in-support, and statement of facts filed by Dr. Jones. *See* Doc. Nos. 141-143. Nelson filed a response to Dr. Jones' motion and a response to her statement of facts (Doc. Nos. 152-153). Dr. Jones' statement of facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute, and Dr. Jones is entitled to judgment as a matter of law.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

[1] Nelson also sued Jorge Dominicis, the Chief Executive Officer of Wellpath LLC (formerly Correct Care Solutions), and George Wilson, Manager of the ADC's Compliance Office, but those claims were dismissed for failure to exhaust administrative remedies. *See* Doc. Nos. 114 & 118.

P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, and must instead demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not

genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III. Facts

### *Nelson's Exhausted Claims*

Nelson claims that Dr. Jones failed to adequately treat pain and swelling in his leg, deep vein thrombosis (DVT), and a pulmonary embolism from July 8, 2017, through August 5, 2019, while he was incarcerated at the ADC's Wrightsville Unit. Doc. No. 6 at 6-25. His claims have been limited to the following encounters with or treatment by Dr. Jones:

(1) Nelson's claim that Dr. Jones made him walk back to his barracks with only a cane even though he could not walk properly after a July 8, 2017 encounter.

He claims he fell as a result, but Dr. Jones would only give him a crutch. *See* Doc. No. 6 at 6-7; Doc. No. 114 at 9 & 24 (limiting Nelson's claim to that described in Grievance WR-17-00253).

(2) Nelson's claim that Dr. Jones failed to timely see him after he submitted a sick call request on July 14, 2017; she examined him on July 23, 2017. *See* Doc. No. 6 at 7-8; Doc. No. 114 at 8-9 & 24 (limiting Nelson's claim to that described in Grievance WR-17-00252).

(3) Dr. Jones' refusal to allow Nelson to have a cane on three occasions: May 21, 2017, August 30, 2017, and October 4, 2017. *See* Doc. No. 6 at 13; Doc. No. 114 at 9-10 & 24 (limiting Nelson's claim to that described in Grievance WR-17-00349).

(4) Nelson's claim that Dr. Jones ordered only a partial ultrasound of his leg in March 2018. *See* Doc. No. 6 at 13-14; Doc. No. 114 at 10 & 24 (limiting Nelson's claim to that described in Grievance WR-18-00106).

(5) Nelson's claim that on March 20, 2018, Dr. Jones told him he would be sent for a consult for vein stripping, but on March 27, 2018, he received a notification that he needed no further follow-up. *See* Doc. No. 6 at 13-14; Doc. No. 114 at 10 & 24 (limiting Nelson's claim to that described in Grievance WR-18-00105).

(6) Nelson's claim that after he had surgery on May 25, 2018, for blood clots, his INR[2] levels were not appropriately monitored after he was returned to the ADC. *See* Doc. No. 6 at 16; Doc. No. 114 at 10-11 & 24 (limiting Nelson's claim to that described in Grievance WR-18-00191).

(7) Nelson's claim that Dr. Jones cancelled his follow-up appointment with a vascular surgeon scheduled for October 18, 2018. *See* Doc. No. 6 at 17; Doc. No. 114 at 11 & 25 (limiting Nelson's claim to that described in Grievance WR-18-00362).

### *Nelson's Relevant Medical Records*[3]

*May 15, 2017 to July 7, 2017 Treatment*

On May 15, 2017, Nelson was temporarily transferred to the Ouachita River Unit for complaints of back pain; a decision was made to wean him from gabapentin. Doc. No. 143-1 at 63-64. On May 21, 2017, he was evaluated by Dr. Jones for his complaint of back pain after transferring back to the Wrightsville Unit. *Id.*

[2] "INR" refers to the prothrombin time, a blood test used to evaluate blood clotting. According to the Mayo Clinic, "the prothrombin time is monitored if you are taking the blood-thinning medication warfarin. In this situation, the prothrombin time is expressed as an international normalized ratio (INR)." https://www.mayoclinic.org/tests-procedures/prothrombin-time/about/pac-20384661.

[3] Dr. Jones submitted copies of Nelson's medical records from May 15, 2017, through June 17, 2019 (Doc. No. 143-1) and a declaration by Christinah Lee, Regional Medical Records Director for WellPath LLC (Doc. No. 143-2). Lee declared under penalty of perjury that the medical records submitted were true and accurate copies of Nelson's medical records kept in the ordinary course of business.

According to Dr. Jones' notes, Nelson was uncooperative during the exam and his complaints were not consistent with physical findings. *Id.* She noted that he got minimal activity throughout the day and was obese, without diagnosed chronic health problems at that time. *Id.* Dr. Jones recommended lifestyle modification, weight loss, and daily exercise. *Id.* Dr. Jones noted that he entered the room with a cane, and she encouraged him to limit use of the cane, which she did not believe he needed. *Id.* It was also noted during both May encounters that he was already scheduled for neurosurgery evaluation. *Id.*

Nelson was examined by Dr. Jones again on June 25, 2017, after the neurosurgery consult. Doc. No. 143 at 62-63. Dr. Jones noted that there was no recommendation for back surgery. *Id.* Nelson was noted as being unwilling to exercise, disputed he was overweight, and was argumentative. *Id.* Because he had no deficit in strength and no neurosurgery recommendation, Dr. Jones asked him to leave the cane. *Id.* Nelson stated that he could not walk without it; however, Dr. Jones recorded he ambulated out of the infirmary without assistance and, by the time he made it to the door of his barracks, he had almost no limping gait. *Id.*

A nurse practitioner saw Nelson on July 7, 2017, for a complaint of back pain, loss of breath, mobility issues, numbness in the left arm and leg, and his belief he suffered a stroke. Doc. No. 143-1 at 62. He claimed he could not move his left leg and kept it straight, although he was able to do straight leg raises. *Id.* He was not

calm and was noted as hyperventilating. *Id.* The nurse gave Nelson a Toradol shot and told him that back pain would not cause him to be unable to move his left leg at all. *Id.* She also told him that his subjective complaints did not match his clinical exam and MRI reports. *Id.* The nurse noted that Nelson's bunkmate informed her that Nelson moved around normally while he was in the barracks. *Id.*

*July 8, 2017 Encounter*

Dr. Jones had a follow-up encounter with Nelson on July 8, 2017. Doc. No. 143-1 at 61. She called him to the infirmary for evaluation after she was informed he had fallen the previous day. *Id.* Nelson stated that the day before he had developed "severe cramping in both hands, which caused loss of strength/sensation in both [upper extremities associated] with paralysis." *Id*. Nelson reported on July 8 that his symptoms the day prior "rapidly spread to both legs and he fell to the ground unable to support his own weight." *Id.* Dr. Jones noted he claimed to try to grab another inmate to stop his fall, but he did not want to make that person fall too, so he let go. *Id.* He was unable to explain how he reached out and grabbed the other person if he was paralyzed. *Id.* Dr. Jones noted the nurse practitioner's exam was not consistent with his complaint and he was equally uncooperative with Dr. Jones. *Id.* Nelson stated everything had resolved except for numbness in his left leg. *Id.* During the July 8 encounter, Dr. Jones recorded an exam of both his upper and lower extremities and her findings were normal. *Id.* She noted that his symptoms were

not consistent with the exam and that his claimed temporary paralysis was resolved, although there was continued reported loss of sensation and strength in his left lower extremity. *Id.* Dr. Jones gave Nelson a cane to help with his subjective unresolved weakness and referred him to mental health. *Id.* Upon leaving the infirmary and stopping at the pill call window, Dr. Jones noted she saw him "lunge" forward and fall, so she examined him briefly. *Id.* at 62. She did not note any injury and reiterated his need for referral to mental health. *Id.*

*July 16, 2017 Sick Call & July 23, 2017 Encounter*

Nelson submitted a sick call on July 16, 2017, stating that feeling started coming back into his leg after he started taking aspirin, but his left leg was swollen, itching, and throbbing. Doc. No. 143-1 at 60. The sick call was triaged that same day and, the following day, an RN made a referral to the provider. *Id*. Dr. Jones examined Nelson on July 23, 2017, for evaluation of left lower leg swelling. *Id.* at 59. She noted she had seen him previously for his report that he was unable to move the leg and had no sensation. *Id.* He stated he regained function of the leg. *Id*. Dr. Jones noted on July 23:

> Pt has been using crutch, and had also been using shoe string to "lift" the foot. Several officers assigned to barrack 1 have reported that he has been wrapping/tying leg with socks and shoe strings and holding it up while trying to use the crutch. He leaves crutch at door today and walks across room, sits on exam table and removes socks and shoes. Pt is afebrile, no [short of breath or chest pain]; denies [history of pulmonary embolism]/DVT.

*Id.* Nelson's physical findings upon Dr. Jones' exam included a negative observation of his left calf being warm, slightly larger than the right, and tender to palpation. *Id.* Dr. Jones assessed Nelson as having leg swelling and pain and noted concerns for DVT versus cellulitis, and that she suspected his condition was "at least partly due to compression by home-made 'sling,' but still need to rule out pathology." *Id.* She prescribed pain medication and an antibiotic prophylactically in case he had cellulitis. *Id.* at 59 & 61. She also scheduled an ultrasound and follow-up in one week. *Id.*

*July 27, 2017: DVT Diagnosis*

On July 27, 2017, Dr. Jones saw Nelson after acute DVT was discovered on an ultrasound performed that day. Doc. No. 143-1 at 57-59. Dr. Jones admitted Nelson to the infirmary ward for anti-coagulation therapy and further work up. *Id.* She noted her prior concern on July 23 that he had DVT, particularly because he had been non-ambulatory for several days and was refusing to walk despite the ability to do so. *Id.* Nelson's physical findings during the July 27 exam were inconsistent with his subjective complaints, and Dr. Jones reiterated that he had tied a shoestring around his leg and "carried" his leg on several occasions ambulating about the compound, then at other times walked without assistance. *Id.* After these activities, he developed his current symptoms. *Id.* Dr. Jones noted he was walking with a limp and he stated ambulation was painful, but he did not have any strength deficit and

he had sensation. *Id.* Dr. Jones informed Nelson that his actions over the past couple of weeks likely lead to his DVT. *Id.*

*August 1, 2017 to October 4, 2017 Treatment*

Dr. Jones saw Nelson again on August 1, 2017. Doc. No. 143-1 at 55-56. She noted that he was stable and walking without assistance, although he complained of pain in his left lower extremity. *Id.* She reviewed his history and status, including his INR being at therapeutic range. *Id.* She also noted that she found CT chest results from July 2017 interesting: he had "no acute PE [pulmonary embolism] but bilateral filling deficit consistent with multiple small chronic PE." *Id.* Nelson mentioned his grandfather had recurrent blood clots, and Dr. Jones noted that a clotting factor full lab work up was pending. *Id.* She recommended compression stockings. *Id.*

During an infirmary encounter on August 4, 2017, Nelson's leg was noted to no longer be hot, there was no erythema, and the size had decreased. Doc. No. 143-1 at 54-55. Infirmary observation and prescriptive orders continued. *Id*. at 53-54.

Dr. Jones discharged Nelson from the infirmary on August 7, 2017. *Id.* at 52-53. He was noted to be a poor historian and uncooperative at times, which was a persistent pattern. *Id.* at 53. He was noted as ambulating without assistance, but had not been as active as they encouraged. *Id.* He stayed in bed and walked around the room "only after being prompted to do so by staff." *Id*. Dr. Jones noted:

> Unfortunately, this behavior probably directly contributed to development of DVT by refusing to ambulate for several days. It is interesting that we have uncovered the chronic lung embolisms; and suggests underlying clotting disorder, hypercoagulopathy.

*Id.* At discharge on August 7, Nelson ambulated to the exam room without assistance, climbed on the exam table, and sat with his legs uncrossed. *Id*. His left lower edema had completely resolved, with residual tenderness around the ankle and distal calf. *Id.* His INR was normal at 3.1. *Id.* He was given an information sheet about diet and green vegetables, instructed to ambulate throughout the day, and to wear his TED (compression) hose during the day. *Id.*

Nelson reported to the infirmary on August 16, 2017, using a crutch. Doc. No. 143-1 at 51. He complained of swelling and tingling in his left leg for three days, and his INR had slipped down. *Id.* Dr. Jones noted that he has Factor V, a generic blood clotting disorder. *Id.* They discussed his labs and his condition. *Id.* Upon exam on August 16, Dr. Jones noted that Nelson's lower leg and ankle were warm, but there was no edema, and his peripheral pulses were present. *Id.* He was able to bear weight and ambulate without assistance. *Id.* Medication adjustments were made. *Id*.

Dr. Jones saw Nelson on August 30, 2017, for follow-up. Doc. No. 143-1 at 50-51. Nelson was still refusing to walk any distance without a cane or a crutch, although it was consistently noted in his records that he could ambulate without assistance. *Id.* Dr. Jones noted that Nelson became "incredibly argumentative," but

then requested to be added to the medical walk list so he would be able to walk in the gym. *Id.* During the encounter, Nelson requested new compression stockings, claiming his were torn up although they were issued less than a month prior. *Id.* The crutch was confiscated and was noted to be torn up as well, although it had been in good shape when issued. *Id.* Medication adjustments were made. *Id.*

On September 6, 2017, Nelson was seen by Dr. Jones for follow-up. Doc. No. 143-1 at 50. His status was outlined relating to his medication and the provision of compression stockings. *Id.* He was noted as continuing to complain of pain and intermittent swelling, but records also revealed that he was not wearing his stockings and had refused Coumadin (an anticoagulant) for two days. *Id.* On September 6, Dr. Jones noted:

> He . . . has been incredibly noncompliant with recommendation for increased walking/activity. He is not wearing the stockings and has refused Coumadin x 2 days. Pt yesterday c/o pain and complete loss of function in L leg; in fact, refused to walk to infirmary and nursing staff was called to barrack. He was transported by wheelchair for eval, and apparently left infirmary with wheelchair unassigned. Today, he says he can walk but "with a limp and my balance is off because of my back". He is argumentative, belligerent; DON Trice and nurse Hopson were both present during interview and physical exam. I clearly explained to him (again) that his presentation and complaints were inconsistent with exam and diagnostic studies. I further explained that his noncompliance with treatment was putting himself at risk for serious medical complications including stroke, pulmonary embolism, and even death. I have talked with him about plan of care going forward, and that if he continues to be uncooperative and dishonest, this constitutes malingering and will be subject to disciplinary action.

*Id.* Dr. Jones' objective assessment revealed a normal exam (other than his DVT). *Id.* She further noted:

> . . . pt sits on exam table with arms rested at sides, stands with weight shifted to r leg, but when force applied from behind, he balances himself and does not fall forward, arms over head while standing to remove shirt, sits again and pulls legs up to remove socks, steps down from table and walks from room with L leg dragging

*Id.* Dr. Jones concluded her September 6 treatment note informing the patient that his malingering was subject to disciplinary action, specifically his use of a wheelchair and assistive device when they had not been approved and for which he had no medical authorization. *Id.* Nelson was also informed that he would be required to sign a refusal for any missed doses of his anticoagulant medication.

Medication adjustments continued to be made. Doc. No. 143-1 at 48-49. Dr. Jones recommended that Nelson's Coumadin be crushed and that the pill call nurses watch him swallow it because she was concerned that he was "cheeking" (not swallowing) his medicine. *Id.* at 48.

On October 3, 2017, Dr. Jones performed a record review and made a thorough note encapsulating the prior months of the medical history of Nelson, "an extremely difficult patient" who she referred to mental health due to his harmful behavior. Doc. No. 143-1 at 46-47. She explained Nelson's diagnosis and treatment and the seriousness thereof, as well as both his exaggeration of his issues and his continued lack of cooperation and self-sabotage. *Id.* Dr. Jones stated:

44yo wm, continued c/o back and leg pain. His symptoms are atypical, inconsistent, and not supported by numerous exams and office visits. He has at times reported full inability to walk or stand, with spontaneous resolution when confronted. He has been incredibly uncooperative with medical staff and with recommended treatment options (including exercise - he refuses yard call; weight loss – weight increased steadily over past yr; stretching - could not demonstrate any of the examples given in handout on previous visits); he has requested medications that are not FDA approved for chronic pain and has insisted that he be referred again to neurology for epidural steroid injections, which were discussed at his last outside visit. I have explained that these are not actually first line therapy, rather the lifestyle changes that he refuses to make are not only primary recommendations but also most effective. I have also shared with him the latest guidelines according to EBM: "efficacy is unclear due to inconsistent results as well as heterogenous populations and interventions in randomized trials. In 2014, the FDA issued a drug safety communication about epidural infection of glucocorticoids, noting the potential for rare but serious adverse effects - loss of vision, stroke, paralysis, and death. and that effectiveness has NOT been established. Risk outweighs benefit; NOT recommended for nonspecific chronic low back pain." (up to date)

Pt has actually taken rather drastic measures to misrepresent his condition, the most outstanding was the act of tying his L leg up in a "sling" made from socks and carrying it in flexed position, with crutches; for days, he refused to use the leg - which resulted in DVT. As this would not typically cause such a finding, further investigation was taken and he was found to have a genetic hypercoaguable state (factor V Leiden). I have explained the condition to him, and explained that given his increased risk for clotting, he needed to not only comply with pharmaceutical treatment, but also to increase his activity, including walking (without assistive devices). He has continued to exaggerate his symptoms, often falling in front of other inmates, requesting help in standing/walking/feeding; he has refused to give up crutch and was even guilty of taking wheelchair from infirmary without permission or script to do so (pt received disciplinary action for this). This is clearly factitious disorder, "deceptive behaviors that are used to falsify symptoms or induce injuries". Persistent nature of factitious behaviours can lead to significant morbidity and mortality. Per EBM :

"pts may feign symptoms and illnesses by:

exaggerating or fabricating symptoms (done)

aggravating genuine, existing illness by not adhering to medical recommendations*******

tampering with medical instruments, devices (done)

coaching others to provide fals (sic) information to clinicians related to symptoms (done)"

"factitious disorder can lead to diagnostic and therapeutic procedures that result in irreversible morbidity. Deaths may also occur because patients underestimate the lethality of their behavior". This is particularly relevant in his case - as his hypercoaguable disorder predisposes him to clotting not just in legs but also in lungs and brain, leading to heart attack, stroke, and sudden death. I have explained all of this to Mr. Nelson. We have also made every effort to ensure that his condition is treated, including now crushing and observing his Coumadin therapy.

Brief review of diagnostics:
most recent - EMG, normal. Pt had XRAY at this visit which showed a positive sagittal balance, HOWEVER this can be affected by arm and leg position and the actual curvature of spine was normal. Furthermore, he had complete spine series (ap, lateral, flexion/extension) in June which revealed no deformity, instability, or spondylolisthesis on dynamic imaging.

MRI, 2017 - loss of disc signal in L4-5 disc space with very small disc bulge. No focal disc or nerve compression

u/s LLE, 7 /2017 - nonocclusive thrombus in L common femoral vein. Thrombus extends to deep vein of calf

CT chest 7 /2017 - bilateral chronic nonocclusive pulmonary emboli . no evidence\ of occlusive acute PE

for further information on patients actions, previous visits can be reviewed in eomis. This is an extremely difficult patient. He has been referred to mental health, but I do not recommend any further outside

> medical assistance (unless unforeseen change/deterioration in his present condition).

*Id*.

Dr. Jones had a follow-up visit with Nelson on October 4, 2017, to discuss his complete and normal electromyography results which verified that there were no neuromuscular abnormalities. Doc. No. 143-1 at 46-47. Her notes reflect that she wanted "to again try to come to some sort of resolution of his actions." *Id.* On October 4, Nelson was noted as refusing to walk without requesting a cane or personal assistance. *Id.* Dr. Jones noted she explained to him several times that his failure to comply with medication and treatment decisions places him at "increased risk for serious complications, including stroke and death." *Id.* at 46. Dr. Jones noted that since the pill call nurses had begun crushing his medication and watching him swallow, they were beginning to see improvement in labs. *Id.* She also expressed her concern that he was going against diet recommendations and "attempting highest intake possible of foods that will interfere with his treatment." *Id.* Dr. Jones made appropriate medication adjustments and noted that she spent more than 30 minutes with the patient, with the HSA present, in order to clearly explain the consequences if he continued his uncooperative behavior. *Id.*

*March 14, 2018 Ultrasound Consultation*

On March 14, 2018, Dr. Jones prepared a consultation request for Nelson to receive a Doppler ultrasound of his left lower extremity relating to DVT. Doc. No. 143-1 at 44. Her notes for the technician explained that the patient has hypercoaguable disorder and that he has a large, occlusive DVT in the left lower extremity that needs to be followed to resolution. *Id.* Reference was made to a prior ultrasound, and Dr. Jones stated that vascular intervention would be recommended if there is no clearance. *Id.*

*March 20 Encounter*

An ultrasound was taken of Nelson's leg on March 20, 2018, and reviewed by Dr. Jones that same date. Doc. No. 143-1 at 43. It revealed a new popliteal DVT and continued thrombus in the common femoral veins. *Id.* Dr. Jones called Nelson in that same date, March 20, to discuss the ultrasound results and the Arkansas Heart Hospital's recommendation if there was no clearance of the clot. *Id.* Dr. Jones informed Nelson that she agreed with the recommended interventional procedures. *Id.* Medications were prescribed and an authorization for a cane was added "to help with transfers" when Nelson was sent out for evaluation treatment. *Id.* He was also given a chair at his bedside so he could elevate his leg at night. *Id.* Dr. Jones also prepared a consultation request for vascular surgery evaluation. *Id.* at 41.

On March 28, 2018, Dr. Jones signed a "medical department notification of diagnostic results" wherein she checked that there was no need for clinical follow-up (with her) because she had already discussed the ultrasound results and the vascular evaluation plan with him (on March 20). Doc. No. 143-1 at 38. The notification informed Nelson that if he wanted to discuss his "test results" with a member of medical staff, he could submit a sick call to do so. *Id.*

*May 26, 2018 Encounter & INR Levels*

On May 26, 2018, Nelson returned from the Arkansas Heart Hospital after a thrombectomy procedure, *e.g.*, surgical removal of the blood clot. Doc. No. 143-1 at 33-36. He was seen by Dr. Jones and admitted to the ward for observation. *Id.* at 29-32. Anticoagulant prescriptions were issued, and a note was made to check his Prothrombin Time/ INR frequently until it was greater than 2. *Id.* at 35. After the patient had been on the anticoagulant a few days as prescribed, his first INR value on May 31 was 1.2. *Id.* at 28. On June 4, his INR value was 1.7. *Id.* at 25. On June 14, his INR value was 2.5, within normal limits. *Id.* at 26. On June 18, his INR value had dropped to 1.7. *Id.* at 25. On June 25, his INR value was 2.2, within normal limits. *Id.* at 24.

*June 28, 2018 to June 17, 2019 Treatment*

Nelson was seen for follow-up at the Arkansas Heart Hospital on June 28, 2018. Doc. No. 143-1 at 28-23. He had a normal transthoracic echocardiogram with

only mild tricuspid regurgitation visualized. *Id.* at 21-22. He also had a CT of his chest which indicated that there was no effusion or pneumothorax and, other than a small region of the right upper lung which may have represented a mild infection/inflammation, the remaining lungs were clear. *Id.* No embolism was noted. *Id.* at 23. The vascular specialist did not recommend a follow-up visit; rather, he noted that the patient could follow- up as needed depending upon test results (which ended up being normal). *Id.* at 19.

On July 11, 2018, Dr. Jones completed a consultation request for Nelson to have a CT of his chest in December/January, to ensure clearance of the June 28 small right upper lobe inflammation and stability. Doc. No. 143-1 at 14. Then, on August 29, 2018, she prepared a consultation request for Nelson to receive a Doppler ultrasound of the left lower extremity for reevaluation of his DVT due to his chronic embolism and thrombosis condition. *Id.* at 11. The consult request reiterated that his most recent chest CT was negative for embolism. *Id.*

The September 13, 2018 ultrasound results from the Doppler left lower extremity venous study revealed that there was no evidence of DVT. Doc. No. 143-1 at 10. Since the ultrasound was negative for DVT, no follow-up was needed. *Id.* at 9. Dr. Jones prepared a medical department notification of diagnostic test results informing Nelson that there was no clinical need for follow-up with her. *Id.* at 8. She added a handwritten note, "no clots :)" with a smiley face. *Id.*

On December 27, 2018, Nelson had a CT of his chest for pulmonary embolism evaluation. Doc. No. 143-1 at 6-7. The radiologist report impression was that no pulmonary embolus was seen. *Id.* Nelson was informed that there was no need for follow-up with Dr. Jones regarding his test results, but that he could submit a sick call if he wanted to discuss the results. *Id.* at 5. On June 17, 2019, Nelson had a CT of his left lower extremity relating to his Factor V diagnosis. *Id.* at 2-3. The venous stent was noted in place and no thrombus were identified, nor were there secondary signs of DVT. *Id*. There was no recurrence of DVT and anti-coagulation medication was continued; it was noted that no follow-up was needed at that time. *Id.* at 1.

***Dr. Gary R. Kerstein's Opinion***

Dr. Gary R. Kerstein, a non-party medical doctor employed by WellPath LLC, the contracted private healthcare provider that furnishes medical services to ADC inmates, reviewed Nelson's medical records from 2017 through part of 2019, including those submitted with Dr. Jones' motion for summary judgment (Doc. No. 143-1). Dr. Kerstein prepared a detailed declaration in support of Dr. Jones' motion for summary judgment. Doc. No. 143-3.

According to his declaration, he reviewed each of Nelson's allegations along with the medical records and concluded that Nelson had appropriate access to healthcare and that Dr. Jones provided him with consistent, appropriate treatment within the standard of care for his medical complaints and DVT condition. Doc. No.

143-3 at 15-16. Dr. Kerstein reviewed each of Nelson's claims and reached the following conclusions with respect to each claim.

*July 8, 2017 Encounter*

Dr. Kerstein stated that he has no disagreement with Dr. Jones' July 8 assessment and treatment plan. Doc. No. 143-3 at 4. He noted that she conducted a full exam and found that Nelson's symptoms were not consistent with the exam. *Id.* Dr. Kerstein noted that he did not see diagnosis of a medical condition which warranted the use of a cane, crutch, walker, or wheelchair, but if Dr. Jones believed Nelson would benefit by the temporary use of a cane to assist with ambulation, that was within her medical judgment. *Id.* Dr. Kerstein agreed with her decision to refer him to mental health. *Id.*

*July 16, 2017 Sick Call & July 23, 2017 Encounter*

Dr. Kerstein explained that Nelson's July 16 sick call was triaged the same day, and the next day, an RN referred him to the provider. Doc. No. 143-3 at 4. He further explained that a clerk would then schedule the visit with a provider such as Dr. Jones or a nurse practitioner. *Id.* Dr. Kerstein also stated that he saw nothing wrong with Dr. Jones' care and treatment of Nelson during the July 23 encounter. *Id.* at 5. He noted that Dr. Jones prescribed pain medication as well as antibiotics in case he had cellulitis and scheduled an ultrasound and follow-up appointment one

week later. *Id.* Dr. Kerstein opined that Dr. Jones made intelligent assessments, developed a good plan, and provided appropriate care. *Id.*

*Cane Use*

In his review of Nelson's medical records, Dr. Kerstein noted each time that Dr. Jones recommended Nelson ambulate on his own without the use of a cane or other walking assistance. Doc. No. 143-3 at 2-12. He specifically noted that when Dr. Jones examined Nelson on May 21, 2017, she encouraged to limit his use of a cane. *Id.* at 2. In his opinion, Nelson's physical findings during that exam did not "support a medical need for long term use of a cane." *Id.*

Dr. Kerstein also agreed with Dr. Jones' assessment and treatment decisions on July 27, August 1, August 7, August 16, August 30, September 6, and October 4. Doc. No. 143-3 at 5-12. Dr. Kerstein opined that Nelson's physical manipulation of his leg was certainly not good for it, and Dr. Jones' recommendation for him to ambulate without assistance was completely appropriate. *Id.* According to Dr. Kerstein, Nelson needed to move around independently and frequently, and his conscious refusal to walk and his efforts to avoid using that leg were detrimental to his condition. *Id.* at 6. In Dr. Kerstein's medical opinion, it was better for Nelson to ambulate without assistance -- for him to not use a cane or crutch in an effort to avoid weight-bearing and movement of that leg. *Id.* at 7. According to Dr. Kerstein, he needed to walk under his own weight and to do so frequently. *Id.* Dr. Kerstein

agreed with Dr. Jones' decision to confiscate his crutch on August 30, 2017, and believed her decision to do so was medically appropriate. *Id.* at 8. After reviewing Dr. Jones' treatment of Nelson in September and October of 2017, Dr. Kerstein stated that he agreed with Dr. Jones that Nelson had no medical need for cane during this time period and needed to ambulate without assistance. *Id.* at 8-12.

*March 14, 2018 Ultrasound Consultation*

Regarding the March 14, 2018 ultrasound order, Dr. Kerstein explained that Nelson's belief that Dr. Jones ordered a "partial" ultrasound was in error. Doc. No. 143-3 at 12. The ultrasound was specifically for his entire left leg, specifically looking for DVT. *Id.* Dr. Kerstein opined that it was a proper consult request. *Id.*

Dr. Kerstein reviewed Dr. Jones' medical decisions on March 20, when she reviewed Nelson's ultrasound results with him, prepared a consultation request for a vascular surgery evaluation, prescribed medications, and authorized use of a cane. Doc. No. 143-3 at 12-13. Dr. Kerstein questioned whether he would have prescribed a cane and wondered if perhaps the cane was to ameliorate Nelson's discomfort or concerns until surgery. *Id.* Nelson did not have an acute injury, so to Dr. Kerstein, there did not appear to be an actual medical need for a cane; however, if it encouraged movement in light of his continuing situation and lack of ambulation, Dr. Kerstein did not question Dr. Jones' medical judgment on that point. *Id.* Dr. Kerstein found Dr. Jones' surgical consult appropriate, as well as her signature on a

form stating that she had discussed the ultrasound results with Nelson and did not need to follow up with him again. *Id.* at 13. Dr. Kerstein concluded that Nelson's assumption that he would not receive further care for his DVT was in error. *Id.*

*May 26, 2018 Encounter & INR Levels*

Regarding Nelson's complaint that his INR levels were not properly monitored after his surgery in May 2018, Dr. Kerstein explained that Nelson's INR levels were in fact properly monitored with appropriate adjustments to his medications made. Doc. No. 143-3 at 13-14. Dr. Kerstein further explained that while there was no specific order for such testing, it was specifically noted in Nelson's records for the testing to occur along with the prescriptions. *Id.* Dr. Kerstein explained that, in the prison environment when Coumadin[4] is prescribed, there is automatically a standing order/procedure for INR to be tested on a roughly 10-day basis, or longer when INRs are stable. *Id.* at 14. In this instance, Nelson needed to be on the medication for a number of days for him to get to therapeutic levels for testing to be viable. *Id.* Dr. Kerstein also noted that Eliquis was prescribed July 17, 2018, to replace of Coumadin, after the fluctuations in Nelson's INR levels. *Id.* Eliquis requires no monitoring. *Id.*

*Alleged Cancellation of Vascular Surgeon Appointment on October 18, 2018*

---

[4] Dr. Kerstein referred to Coumadin by its generic name, warfarin.

Finally, regarding Nelson's claim that Dr. Jones canceled a vascular surgeon appointment on October 18, 2018, Dr. Kerstein stated that he did not see anywhere in Nelson's medical records where a consult was written for vascular follow-up in late 2018, or that the unit scheduler set up an appointment to occur in October 2018. Doc. No. 143-3 at 15. He concluded there was no October appointment to cancel. *Id.* Dr. Kerstein does not know to what appointment Nelson is referring, unless the doctor's office attempted to schedule an appointment directly with him which is not how appointment scheduling operates in the prison. *Id.* He also noted that inmates are not told dates of future outside doctors' appointments for security purposes. *Id.* Regardless, Dr. Kerstein agreed with Dr. Jones that the ultrasound Nelson received on September 13, 2018, showing that he had no blood clots confirmed no need for any vascular follow-up and concluded that Nelson was not harmed by failing to have an appointment with a vascular specialist in October 2018. *Id.* at 14-15.

In Dr. Kerstein's opinion, to a reasonable degree of medical certainty, there is no evidence of any level of indifference on Dr. Jones' part toward Nelson's medical needs; rather, the records reflect extensive, thoughtful, researched, and conscientious medical care. Doc. No. 143-3 at 15-16. Dr. Kerstein opined to a reasonable degree of medical certainty that, as a result of Dr. Jones' quality care, and despite Nelson's lack of cooperation with that care, Nelson had a good outcome. *Id.* Dr. Kerstein noted that Nelson has a chronic, lifelong disease and he may have issues in the future,

particularly if he is not compliant with his care; however, when his DVT issues began in July 2017 through 2018, Dr. Jones provided good care in Dr. Kerstein's opinion, as later confirmed by the negative CT in June 2019. *Id.*

## IV. Analysis

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). To succeed with an inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. *Id.; see also Farmer v. Brennan,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

There is no evidence in the record to suggest that Dr. Jones was deliberately indifferent to Nelson's serious medical needs. Rather, Nelson's medical record establishes that Dr. Jones provided appropriate treatment for his complaints of leg

pain and swelling, resulting in the diagnosis of DVT and a genetic condition making it more likely for him to develop blood clots. Dr. Jones also provided appropriate treatment once Nelson was diagnosed with DVT. She recommended he be evaluated by a surgeon, agreed with surgical intervention when it was recommended, monitored his medication and INR levels, and monitored his condition for development of other clots. Nelson has provided no evidence to show that he was not treated appropriately or that he suffered any injury or deterioration in his condition as a result of Dr. Jones' care.

With respect to Nelson's specific claims, he has provided no evidence that Dr. Jones' provided inappropriate care on July 8, 2017, or that he needed more than a cane or crutch to ambulate on that day. There is also no evidence to support his claim that he needed a cane or crutch to walk at any point – rather, the evidence supports Dr. Jones' decision to instead encourage him to walk on his own and more frequently to prevent the development of blood clots. Nelson's subjective belief that he should have been provided a cane is simply a disagreement with her treatment plan and is not evidence of deliberate indifference. *See Davis v. Norris,* 198 F.3d 249 (Table), 1999 WL 1006437, at *1 (8th Cir. 1999) (a disagreement over a particular type of treatment does not give rise to an Eighth Amendment claim). Accordingly, Nelson's claims that Dr. Jones denied him use of a cane or crutch on May 21, July 8, August 30, and October 4 fail.

There is also no evidence that Dr. Jones was responsible for any delay in seeing him after he submitted a sick call on July 16, 2017. Dr. Kerstein explained that a clerk is responsible for scheduling appointments. Dr. Jones examined Nelson on July 23, and she provided appropriate medications and scheduled him for an ultrasound and a follow-up appointment that day.

With respect to Nelson's claim that Dr. Jones ordered a partial ultrasound on March 14, 2018, there is nothing in the record to support that allegation, or that is even possible to order a partial ultrasound. Nelson has come forward with no evidence to support his contention that he only received a partial ultrasound.

Nelson's claim that Dr. Jones told him he would be sent for vein-stripping on March 20, 2018, but he then received notification that he needed no further follow-up, also fails. The record shows that the notification Nelson received indicating there would be no further follow-up meant that there was no further follow-up needed with Dr. Jones because she had already reviewed the ultrasound report with Nelson. On March 20, 2018, Dr. Jones requested that Nelson be sent to Arkansas Heart Hospital for vascular surgery. *See* Doc. No. 143-1 at 41. He had that surgery on May 26, 2018.

There is also no evidence to support Nelson's claim that Dr. Jones failed to properly monitor his INR levels after his May 26 surgery. Nelson's medical records show that testing was to be done until his INR levels reached 2. Doc. No. 143-1 at

29 & 35. Additionally, Dr. Kerstein explained that, in the prison environment when Coumadin is prescribed, there is automatically a standing order/procedure for INR to be tested on a roughly 10-day basis. Doc. No. 143-3 at 14. Dr. Kerstein also explained that a patient needs to be on the medication for a few days before INR levels are taken; according to Nelson's medical records, he had been on a different anticoagulant prior to his surgery. *See id.* at 41 (stating that Nelson had been complaint with Pradaxa). Nelson's INR levels were checked May 31, June 4, June 14, June 19, June 25, July 4, July 9, and July 16, 2018, and he was switched to another anticoagulant medication that does not require monitoring on July 17, 2018. Doc. No. 143-1 at 13,16-17, 24-28; Doc. No. 143-3 at 14. Nelson has provided no evidence that to support his claim that his INR levels were not appropriately monitored or that he was harmed by any delay in checking those levels.

Finally, there is no evidence that Dr. Jones canceled a vascular surgeon appointment on October 18, 2018, because the record does not show there was an appointment to cancel. Furthermore, Dr. Kerstein agreed that the ultrasound Nelson received on September 13, 2018, showing that he had no blood clots, confirmed there was no need for any additional vascular follow-up.

## V. Conclusion

Nelson has not met Dr. Jones' evidence with proof that creates a fact question for a jury to decide. The undisputed facts establish as a matter of law that Dr. Jones' treatment of Nelson was appropriate and does not evidence deliberate indifference to his serious medical needs. The undersigned therefore recommends that Dr. Jones' motion for summary judgment (Doc. No. 141) be granted. Nelson's remaining claims of deliberate indifference against Dr. Jones should be dismissed with prejudice.

SO RECOMMENDED this 9th day of June, 2022.

UNITED STATES MAGISTRATE JUDGE